UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| ROBERT A. MORGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:18-cv-464-GMB |
| | ) | |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is the Motion for Summary Judgment filed by Defendant Mercedes-Benz U.S. International, Inc ("MBUSI"). Doc. 28. Plaintiff Robert A. Morgan, in his capacity as Chapter 7 trustee for Deborah Cleveland, has filed a response in opposition to the motion. Doc. 38. MBUSI has filed a reply brief in support of its motion. Doc. 42. Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge. After careful consideration of the parties' submissions and the applicable law, and for the reasons that follow, the court concludes that the Motion for Summary Judgment (Doc. 28) is due to be granted.

## I. JURISDICTION AND VENUE

The court has jurisdiction over the claims in this lawsuit pursuant to 28 U.S.C. § 1332. The parties do not contest personal jurisdiction, nor do they contest that

venue is proper in the Northern District of Alabama. The court finds adequate allegations to support the propriety of both.

## II. FACTUAL BACKGROUND

In February 2005, Deborah Cleveland began working as a "team member" in the assembly department at MBUSI's manufacturing facility in Vance, Alabama. Doc. 30-1 at 14. Cleveland operated forklifts, unloaded train cars and trailers, and staged parts. Doc. 30-1 at 18; Doc. 30-3 at 5. Initially, Cleveland worked the A and B shifts, which were afternoon and evening shifts and rotated every two weeks. Doc. 30-1 at 17. She then moved to the C shift because she suffered from Meniere's disease[1] and because she needed to be home when her son returned from school. Doc. 30-1 at 17–18. The C shift was an overnight shift that allowed Cleveland to be home when her son got off the school bus and enabled her to attend doctor's appointments. Doc. 30-1 at 18. The C shift ran from 10:39 p.m. to 6:21 a.m. and did not rotate with any other shifts. Doc. 30-3 at 4; Doc. 30-4 at 2. To move to the C shift, Cleveland wrote a letter to her assistant manager and MBUSI found a coworker with whom Cleveland could swap shifts. Doc. 30-1 at 18.

In logistics, Jay Smith (a "group leader") was Cleveland's supervisor for

---

[1] "Meniere's disease is a disorder of the inner ear that can lead to dizzy spells (vertigo) and hearing loss." It is chronic and causes episodes that occur without warning, which "usually last 20 minutes to several hours, but not more than 24 hours." Meniere's Disease, MAYO CLINIC, available at https://www.mayoclinic.org/diseases-conditions/menieres-disease/symptoms-causes/syc-203749 10 (last visited March 3, 2020).

approximately a year and a half. Doc. 30-3 5.  While Cleveland was working in the logistics department, Smith and other supervisors encouraged her to become a group leader and Smith cross-trained her in all jobs in the department. Doc. 30-1 at 39. Smith did not cross-train all team members in his group. Doc. 30-1 at 39.

MBUSI team members are governed by an attendance policy, HR02, which is a progressive discipline policy based on the number of violations (known as "occurrences") an employee accrues in a given period of time. Doc. 30-7 at 2; Doc. 30-6 at 7–21.  There were four levels of discipline under the policy: Level I, Level II, Level III, and Termination Corrective Performance Reviews ("CPRs"). Doc. 30-7 at 2.  Being late for a shift results in one occurrence, an unexcused absence with a phone call beforehand results in two occurrences, and an unexcused absence without a phone call results in three occurrences. Doc. 30-7 at 3.  If an employee accrues three or more occurrences in a 180-day period, she receives a Level I CPR. Doc. 30-7 at 3.  If she receives three or more occurrences in a 180-day period within the next 360 days, she receives a Level II CPR. Doc. 30-7 at 3.  Three or more occurrences in a 180-day period during the following 360 days results in a Level III CPR. Doc. 30-7 at 3.

After a Level III CPR, MBUSI usually requires team members to "write a letter explaining what they are going to do to solve the [attendance] issue." Doc. 30-7 at 3.  Finally, another three occurrences during a 180-day period within the next

360 days of a Level III CPR results in a suspension pending termination. Doc. 30-7 at 3. During an employee's suspension, MBUSI will investigate to ensure that its decision to terminate employment complies with all policies and procedures. Doc. 30-7 at 3. If so, it terminates the individual's employment. Doc. 30-7 at 3. David Olive, a Human Resources Senior Manager, is not aware of any team member who has received three or more occurrences after a Level III CPR whose employment was not terminated. Doc. 30-7 at 4.

HR02 provides for vacation and emergency vacation time for employees. Doc. 30-7 at 4. All production team members are required to reserve four vacation days for the week of the Fourth of July holiday, when MBUSI shuts down its production plant. Doc. 30-7 at 5. HR02 also allows for a personal leave of absence. Doc. 30-7 at 4. To qualify for a personal leave of absence, an employee must have worked at least 1,250 hours in the preceding 12 months. Doc. 30-7 at 4–5. This policy applies to extended periods of time off, and not "short periods of time such as a day's absence or casual attendance issues." Doc. 30-7 at 5. Additionally, MBUSI has a policy for family medical leave pursuant to the Family Medical Leave Act ("FMLA"), HR08. Doc. 30-7 at 4; *see also* Doc. 30-6 at 30–37. To request leave, employees must submit a packet containing an application and other information at least 30 days in advance of the requested leave. Doc. 30-7 at 5; Doc. 30-6 at 35.

Cleveland suffers from Meniere's disease, which causes episodes of "extreme vertigo," nausea, migraines, and impaired balance. Doc. 30-1 at 11. She testified that there is no warning prior to the onset of her symptoms, and the symptoms can last for several hours, several days, or even a month at a time. Doc. 30-1 at 12. She also testified that when an episode occurs, she "should not be" operating a forklift, and that she often gets off of her forklift and sits down to try to alleviate the symptoms. Doc. 30-1 at 12. She also has walked to the MBUSI medical center during episodes. Doc. 30-1 at 12. At various times, Cleveland used vacation, emergency vacation, and FMLA leave to cover absences due to her Meniere's episodes. Doc. 30-1 at 25 & 37–38; Doc. 30-4 at 2–3; Doc. 30-9 at 6.

In 2015, Cleveland had surgeries on her neck and shoulder. Doc. 30-1 at 11, 35 & 38. The shoulder surgery caused Cleveland to miss three months of work, and after she returned to work she had the neck surgery late in 2015. Doc. 30-1 at 38. The surgeries caused Cleveland to use her FMLA leave time and miss a significant amount of work. Doc. 30-1 at 13 & 38.

In August 2015, Cleveland received a Level I CPR for violating MBUSI's attendance policy by missing work after "call[ing] in sick" on April 8 and 9 and August 17, 18, 19, and 26 of 2015. Doc. 30-1 at 30; Doc. 30-2 at 63. The CPR noted that Cleveland "has medical problems that are documented which continuously cause her to miss working her scheduled shifts." Doc. 30-2 at 63. In October 2015,

Cleveland earned a Level II CPR for missing work from September 13 to September 17, on September 30, and on October 1. Doc. 30-2 at 65.  On September 17, Cleveland had applied for a personal leave of absence for September 13 through September 18, explaining that she was suffering complications from her Meniere's disease and that she had "exhausted all of [her] vacation and . . . FMLA" leave due to the shoulder surgery. Doc. 30-2 at 67.  Cleveland was counseled to use her vacation and emergency vacation time more efficiently to avoid unexcused absences. Doc. 30-2 at 65.  Subsequently, in January 2016, Cleveland received a Level III CPR for absences on October 19, 20, 28, and 29 of 2015. Doc. 30-2 at 68. She was again counseled to use her vacation and emergency vacation time more efficiently. Doc. 30-2 at 68.

Following the Level III CPR, Cleveland wrote a letter dated January 6, 2016, in which she stated that she planned to use her vacation and emergency vacation time "more wisely" in 2016. Doc. 30-2 at 70.  She explained that she was taking less vacation time in advance so that she could reserve vacation days for potential flareups of her Meniere's disease symptoms. Doc. 30-2 at 70.  Cleveland stated that while her symptoms were out of her control, she understood that she has "a job to do" and has to "correct [her] attendance issues if [she] want[s] to continue [her] employment" at MBUSI. Doc. 30-2 at 70.  She concluded by stating that she "intend[s] to work hard to be at work on time every day as much as I possibly can."

Doc. 30-2 at 70.

About one month later, on February 2, 2016, Cleveland applied for FMLA leave to cover absences from January 28 to February 1. Doc. 30-2 at 71. Notations on her application form reflect that Cleveland had no FMLA leave available and would instead use vacation days to cover the absences. Doc. 30-2 at 71. In the summer of 2016, Cleveland's grandmother's sister died. Doc. 30-1 at 34. Cleveland requested bereavement leave to attend the funeral, but MBUSI denied her request because Cleveland's great aunt was not an "immediate family member" as defined by its bereavement leave policy. Doc. 30-1 at 34; Doc. 30-3 at 8; Doc. 30-6 at 7–8.

During the week of the Fourth of July, MBUSI requires all production employees to take four days of vacation time due to a plant shutdown. Doc. 30-5 at 14 & 17; Doc. 30-7 at 5. MBUSI does not permit employees to use vacation days reserved for the summer shutdown to "cover absences that could not otherwise be covered." Doc. 30-7 at 6. If a production employee were to use all of her allotted vacation time prior to the summer shutdown, she would be assessed occurrences for some or all of the four days during the shutdown. Doc. 30-5 at 16–17.

Every year, MBUSI conducts a manpower analysis based in part on the assumption that all production employees will use four days of vacation time to cover the summer shutdown. Doc. 30-5 at 18; Doc. 30-7 at 6. The analysis accounts for "a certain number of [employees] to be off every day[.]" Doc. 30-5 at 18; *see*

7

*also* Doc. 30-7 at 6 ("In conducting its manpower analysis, MBUSI takes into account that all production team members must reserve four days of vacation for the summer shutdown. MBUSI then plans its manpower needs accordingly."). If production employees were permitted to use their summer shutdown vacation days at other times in the year, "MBUSI's manpower analysis would be inaccurate, its manpower planning would be erroneous, and its production schedules would be disrupted." Doc. 30-7 at 6. This would cause "catastrophic impacts on MBUSI's production and would impose severe production and financial hardships on MBUSI." Doc. 30-7 at 6. If each of MBUSI's approximately 3,200 production employees took one day of additional vacation time before the summer shutdown, MBUSI would experience "25,600 lost production hours in a six month period." Doc. 30-7 at 6.

Additionally, MBUSI permits only a certain number of production employees in any particular employment group to take vacation on any given day. Doc. 30-7 at 7. Thus, if employees were given the flexibility to use their shutdown vacation days at other times during the year, "due to the allotment restrictions, many MBUSI [employees] would not be able to take their vacation during the year." Doc. 30-7 at 7. According to MBUSI, "[n]ot only would this be unfair, but [it] would create a hardship on those production team members and be disruptive to good employee relations." Doc. 30-7 at 7.

On June 21, 2016, Cleveland called in sick for her overnight shift because of a Meniere's flareup. Doc. 30-1 at 41–42; Doc. 39-1 at 4. Cleveland asked Smith, her supervisor, if she could retroactively apply vacation time to her June 21 absence. Doc. 39-1 at 5. As of June 21, Cleveland had exhausted her emergency vacation time and had 35 hours of standard vacation time, 32 of which were reserved for the summer shutdown. Doc. 30-5 at 36–37. The three remaining hours of vacation time would not cover her June 21 shift, which was scheduled for eight hours. Doc. 30-5 at 36. Additionally, Cleveland was not eligible for FMLA leave because she had worked less than 1,250 hours in the calendar year preceding June 21, 2016.[2] Doc. 30-9 at 14. Because Cleveland was absent with no available vacation time, she was assessed two occurrences. Doc. 30-6 at 101. She had already received two occurrences for an absence on March 29, 2016, so with the June 21 absence Cleveland accrued four total occurrences after her Level III CPR, and therefore was suspended pending termination. Doc. 30-3 at 15–16; Doc. 30-5 at 33.

In addition to her request to retroactively apply vacation time to her June 21 absence, Cleveland asked if she could work during the summer shutdown so that she could use some of the vacation time allotted to the summer shutdown to cover her June 21 absence. Doc. 30-1 at 5. She also signed up to work the shutdown but

---

[2] An employee is eligible for FMLA leave if she has worked for at least 12 months and for at least 1,250 hours during the preceding 12-month period. 29 U.S.C. § 2611(2)(A).

"received no response." Doc. 30-1 at 5. Cleveland had worked the summer shutdown in the past and her "experience is that if an employee wanted to work the summer shutdown they were allowed to do so." Doc. 39-1 at 5–6. According to MBUSI, employees may occasionally work during the summer shutdown to perform "specific tasks," and a signup sheet is posted ahead of time to request to do so, but eligibility to work the summer shutdown is based on seniority. Doc. 30-3 at 19; Doc. 30-5 at 34. Typically, only supervisory employees are permitted to work the summer shutdown to perform "something really specific" like "installing a new piece of equipment," which usually required the expertise of a team leader. Doc. 30-5 at 34.

On June 23, Cleveland wrote a statement in which she discussed the complications she experiences from Meniere's disease in addition to the shoulder and neck surgeries in 2015. Doc. 30-2 at 77. She explained that because of the two surgeries, she had exhausted all of her FMLA leave and therefore could not apply for FMLA leave to cover illnesses caused by Meniere's flareups. Doc. 30-2 at 77. She also expressed her desire to keep her job and attempt to "work through [her] illness[.]" Doc. 30-2 at 77.

On July 15, 2016, MBUSI terminated Cleveland for violating its HR02 attendance policy. Doc. 30-2 at 78. Olive testified by declaration that he is unaware of any production employee "who had a similar discipline record and attendance violations and occurrences as Ms. Cleveland and whose employment was not

terminated." Doc. 30-7 at 8.  After termination, Cleveland received her final paycheck, which reflected that she was being paid for 23.5 hours of emergency vacation time. Doc. 30-7 at 8.  According to Olive, this payment resulted from a "payroll error." Doc. 30-7 at 8.

MBUSI has a peer review process whereby a terminated employee may request a formal review by her coworkers to determine whether a termination decision complied with MBUSI's policies and procedures. Doc. 30-5 at 19–20; Doc. 30-7 at 7.  Following her termination, Cleveland requested a formal review. Doc. 30-1 at 48.  The review panel consists of three hourly employees and two administrative or supervisory employees, all of whom are trained prior to serving and selected blindly. Doc. 30-7 at 7.  The panel reviews the decision and issues a final, binding decision. Doc. 30-7 at 8.  The panel upheld Cleveland's termination. Doc. 30-1 at 51.

Cleveland filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on September 8, 2016 alleging that MBUSI discriminated against her by denying her a reasonable accommodation and by "disparately appl[ying] a rule/policy regarding vacation hours." Doc. 1-1 at 6.  The EEOC issued a notice of right to sue letter to Cleveland on January 10, 2018 informing her that it found "reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge,"

but that it could not obtain a settlement with MBUSI and would not file suit. Doc. 1-1 at 3.

On March 23, 2018, Morgan filed suit on Cleveland's behalf in this court asserting claims under the Americans with Disabilities Act ("ADA") for disability discrimination and the FMLA for interference with the right to take FMLA leave. Doc. 1 at 4–6. Specifically, the complaint alleges that MBUSI discriminated against Cleveland by (1) misrepresenting that she had no vacation time to cover the June 21 absence, (2) denying her use of vacation time reserved for the summer shutdown to cover a previous absence, (3) refusing to modify its policy governing the use of vacation time as an accommodation, (4) disparately applying policies regarding the use of vacation time to cover absences, and (5) denying her request for non-FMLA personal leave. Doc. 1 at 5. The complaint also alleges that MBUSI interfered with Cleveland's FMLA rights by "refus[ing] to allow [her] to use vacation time to cover the June 21 absence because it believed [she] would subsequently qualify for FMLA leave and request such leave because of her physical impairments and recent surgeries." Doc. 1 at 6. According to the complaint, MBUSI suspended and terminated Cleveland to "prevent her from attempting to exercise FMLA rights in the future." Doc. 1 at 6.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## IV. DISCUSSION

### A. Americans with Disabilities Act

Where a plaintiff seeks to prove disability discrimination with circumstantial evidence, as Morgan does here, courts apply the familiar *McDonnell Douglas* burden-shifting framework used in other employment discrimination cases.

*Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).

Thus, Morgan first bears the burden of establishing a *prima facie* case of discrimination under the ADA. *Id.* To establish a *prima facie* case, he must show: "(1) a disability, (2) that [Cleveland] was otherwise qualified to perform the job, and (3) that [Cleveland] was discriminated against based upon the disability." *Id.* If he does so, the burden of proof shifts to MBUSI to "articulate a legitimate, non-discriminatory reason for her discrimination." *Id.* At that point, the burden shifts back to Morgan to show that MBUSI's articulated reason for Cleveland's termination is a pretext for disability discrimination. *Id.*

### 1.    Prima Facie *Case*

Morgan has not established a *prima facie* case of disability discrimination under the ADA because he has not shown that Cleveland was qualified to perform her job. To show that she was qualified, Morgan must prove that, "with or without reasonable accommodation, [Cleveland] can perform the essential functions of the employment position that [she] holds or desires." 42 U.S.C. § 12111(8); *see also Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1256 (11th Cir. 2007). Thus, Morgan must show either that Cleveland can perform the essential functions of her job at MBUSI without an accommodation or, if not, that she can perform the essential functions with a reasonable accommodation. *Holly*, 492 F.3d at 1256. "An accommodation is reasonable and necessary under the ADA, in turn, only if it

enables the employee to perform the essential functions of the job." *Id.*; 29 C.F.R. § 1630.2(o)(1)(ii) (defining "reasonable accommodation[s]" as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position").

"If the individual is unable to perform an essential function of [her] job, even with an accommodation, [s]he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005) (internal quotation marks omitted). Thus, employers are not required to "eliminate an essential function of the plaintiff's job." *Id.* (internal quotation marks omitted). "On the other hand, the ADA may require an employer to restructure a particular job by altering or eliminating some of its *marginal* functions." *Holly*, 492 F.3d at 1256 (internal quotation marks omitted).

"'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(2)(1)). Courts evaluate essential functions on a case-by-case basis and give some deference to an employer's judgment as to which functions of a job are essential. *E.g.*, *Holly*, 492 F.3d at 1257–58. When considering the employer's judgment of the essential

functions of a job, both the company's official position and testimony from a supervisor are relevant. *Id.* at 1257. However, "although the employer's view is entitled to substantial weight in the calculus, this factor alone may not be conclusive." *Id.* at 1258 (internal quotation marks omitted). Other factors to consider are

> (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs.

*Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

MBUSI argues that Cleveland was not qualified for her position because she could not perform an essential function of her job—regular attendance—both with or without a reasonable accommodation. Doc. 29 at 22–26. Morgan counters that Cleveland's absences in 2015 and 2016 were not due to her Meniere's disease, but because she had exhausted her vacation and FMLA leave due to her back and shoulder surgeries in 2015, which were unrelated to her Meniere's. Doc. 38 at 28; Doc. 39-1 at 2–4. He also argues that Cleveland had no attendance issues in 2013 and only received a Level I CPR for being late three times over a 180-day period in 2014 even though she was diagnosed with Meniere's in 2011 and missed work in 2012 due to her illness. Doc. 38 at 28; Doc. 39-1 at 9. Thus, according to Morgan, Cleveland's attendance after her Meniere's diagnosis "satisfied MBUSI's

attendance policy even if she had previously incurred a Level 1 CPR" because "incurring a Level 1 CPR does not mean that the employee has failed to meet MBUSI's attendance expectations as a whole." Doc. 38 at 28.

Morgan's first argument is undercut by Cleveland's admission that her back and shoulder pain, "[i]n addition to dealing with Meniere's disease," limited her "ability to work." Doc. 39-1 at 9. And even accepting the fact that she exhausted her leave time in part due to her surgeries, the later absences still were caused by her Meniere's because, so but for her condition she would not have had to miss work. *See, e.g.*, Doc. 30-2 at 77 (explaining that she could not use leave time in 2016 because when "[her] illness flare[d] up," she had no available leave time "because of the surgeries"). Moreover, Cleveland's contention that her condition did not cause her to miss work in 2013 and 2014 ignores the fact that she received four CPRs in 2015 and 2016 due to absences related to her condition, which ultimately led to her termination. Doc. 30-3 at 29–36. Cleveland acknowledged her health issues in writing several times, stating that she had "tried [her] best" to attend work even when she was "not feeling well," and that while her illness was out of her control, she understood that she has "a job to do and . . . [has] to correct [her] attendance issues if [she] want[s] to continue [her] employment[.]" Doc. 30-3 at 38–39; *see also* Doc. 30-3 at 26 & 28. She testified in her deposition that, after she missed time due to her surgeries in 2016, any other absences she occurred were "[j]ust [due to her]

Meniere's." Doc. 30-1 at 38. Thus, the record demonstrates that Cleveland's Meniere's disease prevented her from meeting MBUSI's attendance requirements.

When attendance is an essential function of employment, "being present on the job" is a requirement for an employee to be qualified. *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir. 1994). The plaintiff in *Jackson*, like Cleveland, incurred absences "on a sporadic, unpredictable basis," and therefore "could not fulfill [an] essential function of his employment, that of being present on the job[.]" *Id.* In that case, the district court had "correctly reasoned that [the plaintiff] . . . failed to prove he is an otherwise qualified individual because he . . . failed to satisfy the presence requirement of the job." *Id.* The *Jackson* plaintiff requested an accommodation to permit him to swap days off with coworkers, delay his start time, or delay physically demanding and less time-sensitive activities on little to no notice when his condition flared up. *Id.* However, because there was no way for the employer to accommodate the "unpredictable nature" of his absences outside of burdening it with "making last-minute provisions for [the plaintiff's] work to be done by someone else," no reasonable accommodation was available. *Id.* at 279–80.

Cleveland, like the *Jackson* plaintiff, incurred absences on an unpredictable basis due to her Meniere's disease which, by her own admission, flared up with no advance notice and for an undetermined amount of time—whether hours, days, or

even weeks.[3]  MBUSI's occurrence-based progressive system of discipline for attendance infractions demonstrates in and of itself the importance of attendance to Cleveland's position (and to automotive manufacturing generally).  Axiomatically, manpower is integral to the production process, and MBUSI projects its manpower needs on a yearly basis. Doc. 30-7 at 6.  Manpower discrepancies or uncertainties could have "catastrophic impacts on MBUSI's production and would impose severe production and financial hardships on MBUSI." Doc. 30-7 at 6.  For this reason, MBUSI permits only a certain amount of production employees to take their vacation time on any particular day, which ensures that all employees are permitted to take vacation at some point in the year and minimizes production disruptions and internal strife among employees. Doc. 30-7 at 7.  By any standard, timely attendance was an essential function of Cleveland's job at MBUSI.

Morgan argues that Cleveland should have been permitted to work during the summer shutdown and to reallocate her vacation days designated for the shutdown to days she had already missed.  In an attempt to do just that, Cleveland spoke with a Human Resources manager "about a week" after she was suspended (and immediately prior to her termination) and requested to "use some of the shutdown vacation to cover the June 21 absence." Doc. 39-1 at 7.  This argument falls short

---

[3] In addition, Cleveland testified that during an episode of Meniere's she was unable to operate a forklift—another essential function of her position in the assembly department. Doc. 30-1 at 12.

for several reasons. First, many courts have found that after-the-fact accommodation requests are *per se* unreasonable. *See, e.g.*, *Alvarez v. Sch. Bd. of Broward Cty.*, 208 F. Supp. 3d 1281, 1286 (S.D. Fla. 2016) ("An employer generally is not required to grant a request for reasonable accommodation after the occurrence of workplace misconduct that warrants demotion or termination."); *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012) ("When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late.'").

Second, this requested accommodation would be unreasonable because it would not have permitted Cleveland to perform the essential functions of her job. Allowing Cleveland to use her summer shutdown vacation time (which every MBUSI production employee must take) to cover previous unexcused absences would not allow Cleveland to perform the functions of her position. Rather, it would have achieved only one end—the *post hoc* transformation of an unexcused absence into an excused one. Moreover, MBUSI has successfully demonstrated an undue burden in the disruption and inequity that would result from its employees' haphazard reallocation of vacation time reserved for the plant shutdown. Thus, even if the requested accommodation would allow Cleveland to perform the essential functions of her position, it is not a reasonable request because of the burden it would impose on MBUSI. Accordingly, such a request, even if timely made, cannot

salvage Morgan's *prima facie* case of disability discrimination.

### 2.    McDonnell Douglas *Burden-Shifting*

Even if Morgan had established a *prima facie* case of disability discrimination on Cleveland's behalf, his ADA claim would fail at the *McDonnell Douglas* burden-shifting stage. MBUSI has articulated a legitimate, nondiscriminatory reason for terminating Cleveland: she violated its attendance policy and accrued enough occurrences to warrant termination. Morgan claims that Cleveland can demonstrate the pretextual nature of MBUSI's stated reason in several ways. He first argues that Cleveland's supervisor encouraged her to quit her employment by stating "that if he were in her shoes, he would quit rather than get fired." Doc. 38 at 35. Morgan makes this argument without citation to the evidentiary record. The closest statement of that nature known to the court appears in the "Problem Solution/Action Plan" in the Level I CPR Cleveland received on August 30, 2015, which states that she "needs to evaluate her health issue with her doctors to see what is in her best interest for her long term well being." Doc. 30-2 at 63. This is a far cry from encouraging Cleveland to quit. Otherwise, Morgan has not pointed the court to any evidence in the record showing that Smith or anyone else at MBUSI directly encouraged Cleveland to quit her employment.

Next, and again with no citation to the record, Morgan takes issue with occurrences assessed against Cleveland in 2015, and argues that certain absences

designated as unexcused were, in reality, excused. Doc. 39 at 36. The argument of Morgan's counsel aside, there is simply no evidence in the record that MBUSI misclassified any of Cleveland's absences—let alone that it did so with any sort of discriminatory animus. Morgan also claims that MBUSI's "managers inexplicably changed their approval of Ms. Cleveland's request for personal leave in September 2015," which led to the assessment of two occurrences. Doc. 38 at 36. Again, this contention comes with no citation to the record and no corresponding supporting evidence. Finally, Morgan claims that MBUSI's denial of Cleveland's request to allocate her shutdown vacation time to a previous unexcused absence demonstrates pretext because, according to one MBUSI employee, such requests have been granted in the past. Doc. 38 at 36. Morgan asserts that "[t]hese departures [from] policy or practice are evidence of an improper motive." Doc. 38 at 36. Yet there is scant evidence in the record that MBUSI departed from any of its policies, and no indication that the employees' permission to work during the summer shutdown was not based on seniority. A single stray remark is insufficient to create a triable issue of fact. *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 13, 148 (2000) (holding that employer is entitled to judgment as a matter of law where the plaintiff "created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred").

Because Morgan cannot establish a *prima facie* case of disability discrimination, his ADA claim on Cleveland's behalf fails. Nevertheless, even if he could meet his *prima facie* burden, MBUSI has articulated a legitimate, nondiscriminatory reason for Cleveland's termination, and Morgan has not put forth sufficient evidence to demonstrate that MBUSI's reason is pretextual. Accordingly, summary judgment is due to be entered in favor of MBUSI on Morgan's ADA claim.

**B.      Family and Medical Leave Act**

"Congress enacted the FMLA to 'balance the demands of the workplace with the needs of families' and 'to promote the stability and economic security of families.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1295 (11th Cir. 2014) (quoting 29 U.S.C. § 2601(b)(1)). The Act requires employers to permit eligible employees to take up to 12 weeks of unpaid leave for medical reasons, for maternity or paternity care, or to care for a close family member with a serious medical condition. 26 U.S.C. § 2601(b)(2). The Act also makes it "unlawful 'for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights." *Evans*, 762 F.3d at 1295 (quoting 29 U.S.C. § 2615(a)(1)). To establish a claim for FMLA interference, a plaintiff "must demonstrate that she was denied a benefit to which she was entitled under the FMLA" and that the violation prejudiced her in some way. *Id.* (internal quotation marks omitted).

As of the date of her termination, Cleveland had not requested any future

FMLA leave. Doc. 30-1 at 55–56. While "an employee requesting FMLA leave need not expressly mention the Act, she must provide notice sufficient to make the employer aware of both the need for qualifying leave and its anticipated timing and duration." *Crawford v. City of Tampa*, 464 F. App'x 856, 858 (11th Cir. 2012). To give sufficient notice, Cleveland must have informed MBUSI "of a potentially FMLA-qualifying reason for [her] absence." *Id.* And "[a]bsent unusual circumstances, an employee must also comply with an employer's usual and customary notice and procedural requirements for requesting leave." *Id.* at 858–59 (internal quotation marks omitted). Here, because Cleveland had not requested FMLA leave as of the date of MBUSI's decision to terminate her, her FMLA interference claim cannot stand.

Moreover, as MBUSI points out, the right to FMLA leave is "not absolute," and "an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010). MBUSI has established that it terminated Cleveland for her repeated violations of its attendance policy, and there is no evidence in the record that Cleveland made any request for FMLA leave, let alone that anyone at MBUSI was aware of such a request (other than the requests that were granted) before her termination. Accordingly, summary judgment on

Morgan's FMLA interference claim is due to be granted.

## V. CONCLUSION

For these reasons, it is ORDERED that Defendant MBUSI's Motion for Summary Judgment (Doc. 28) is GRANTED, and all claims asserted by Plaintiff Robert A. Morgan are DISMISSED with prejudice.

A final judgment will be entered separately.

DONE and ORDERED on March 5, 2020.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE